## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

ANDREW BABINSKI                                   NO.: 3:20-cv-426-SDD-EWD

VERSUS                                            JUDGE SHELLY DICK

TODD QUEEN, ET AL.                                MAGISTRATE ERIN WILDER-
                                                  DOOMES

### MEMORANDUM IN OPPOSITION TO
### DEFENDANTS' MOTION TO DISMISS

MAY IT PLEASE THE COURT:

### INTRODUCTION

In the same way the defendants, Kristin Sosnowsky, Shannon Walsh, John Fletcher, and Alan Sikes, (collectively, "defendants"), effectively expelled Plaintiff Andrew Babinski, ("Babinski"), from their theatre Ph.D. program to avoid dealing with his legitimate complaints, the defendants here signal to the Court they have no interest in this litigation or defending their actions that deprived a student of his academic and vocational future. The defendants appear to believe that they are under no obligation to plead and prove affirmative defenses, to justify their actions as legal exercises of their authority, or to make even a paltry showing as to the legality of their actions. Defendants' motion is simply another instance in a long pattern of substantially mistreating Babinski that started when he refused to keep quiet about his ethical concerns. Defendants silenced Babinski and now ask this Court to silence him again for seeking to vindicate his rights.

Babinski's complaint states factual allegations that, if proven true, would entitle him to relief. Sovereign immunity is not applicable here because the State of Louisiana is not a party and because Babinski alleged claims against the defendants separately in their official and personal capacities. Babinski's paper is protected speech under either of the two potentially applicable

standards, and the defendants must allege and prove affirmative defenses and show their conduct in response to the speech was reasonable. Babinski does have a vested property right or liberty interest in continued enrollment in the program and the defendants cannot arbitrarily expel him without due process. The complaint sufficiently alleges claims for an equal protection violation and conspiracy to violate Babinski's rights because other students were given options to continue their studies where Babinski was not, and the defendants acted in concert to refuse to teach Babinski. And finally, qualified immunity is not appropriate here because the law on all these points is sufficiently established, the defendants' acts were so egregious that no reasonable professor or administrator would believe they were legal, and the defendants have neither alleged nor proven any facts or affirmative defenses that would bring their conduct into even constitutionally questionable territory. In the alternative, and out of an abundance of caution, if the complaint is inconsistent with the discussion contained in this memorandum, Babinski requests leave of court to amend.

LAW AND ARGUMENT

**I.     Babinski's complaint is sufficient under the federal rules of pleading**

A pleading must contain only a short and plain statement showing the pleader is entitled to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (citing Fed. R. Civ. P. 8(a)(2)). The facts stated in the complaint must be plausible on their face, which means the factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

Babinski's complaint contains twenty-three paragraphs of factual allegations. They discuss at length Babinski's selection of and enrollment in the Theatre Ph.D. program, (Rec. Doc. 1 at ¶ 10-11), his excellent academic and disciplinary record before defendants violated his rights, (Rec.

2

Doc. 1 at ¶12), misrepresentations the program and defendants made to Babinski, (Rec. Doc. 1 at ¶¶ 13-15), mistreatment of and retaliation against Babinski when he questioned the content of a course in which he was enrolled, (Rec. Doc. 1 at ¶¶ 16-19), the circumstances surrounding Babinski's speech and a description of the nature of the speech, (Rec. Doc. 1 at ¶¶ 20-23), the retaliatory actions defendants took against Babinski because of his speech (Rec. Doc. 1 at ¶¶ 24, 26-30), an objective finding by two neutral third parties that Babinski's speech was not a cause for concern and was not grounds for discipline, (Rec. Doc. 1 at ¶ 25), the circumstances surrounding Babinski's effective expulsion from the program due to the defendants' arbitrary acts (Rec. Doc. 1 at ¶¶ 29-31), that Babinski was not given sufficient alternatives or options to continue in the program, which options were given to other students similarly situated, (Rec. Doc. 1 at ¶ 30), that the defendants acted in concert to refuse to teach him and prevent his continuation in the program because of his speech, (Rec. Doc. 1 at ¶¶ 29, 31), that Babinski suffered damages as a result of the defendants' actions, (Rec. Doc. 1 at ¶¶ 32, 58), and all the formulaic elements of Babinski's causes of action (Rec. Doc. 1 at ¶ 33-57). Defendants cannot credibly say that Babinski's complaint does not state a claim for the causes of action alleged.

## II.     The Eleventh Amendment does not bar Babinski's suit against these defendants

Neither the State of Louisiana nor its agencies or institutions are defendants in this suit. Rather, Babinski has carefully pleaded both official-capacity and personal-capacity claims against state officials, both of which this Court has subject matter jurisdiction to hear and neither of which offend the Eleventh Amendment.

### A.     *Ex Parte Young* permits claims for prospective relief against state officials in their official capacities

Suits seeking injunctive or prospective relief against state officials do not offend the Eleventh Amendment. *Sessions v. Rusk State Hosp.*, 648 F.2d 1066, 1069 (5th Cir. 1981) (citing

*Edelman v. Jordan*, 415 U.S. 651 (1974); *Ex Parte Young*, 209 U.S. 123 (1908)). This is because a state official who acts in violation of the U.S. Constitution is stripped of his official or representative character under the Eleventh Amendment, making the suit not against the state but against the offending officer. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104 (1984) (citing *Young*, 209 U.S. at 160).

Some of the claims Babinski makes against the defendants are in their official capacities. (Rec. Doc. 1 at ¶¶ 59-64). These official capacity claims alleged in the complaint seek prospective relief only; that is, Babinski's reinstatement into the Theatre Ph.D. program and the removal of unnecessary and unreasonable barriers to his completion of that program, along with attorney's fees. These claims are now and have always been acceptable in this Court because of federal courts' strong interest in vindicating the constitutional rights of citizens and holding state actors accountable to the "supreme authority of the United States." *Id.*

### B.    Defendants in their personal capacities are not arms of the state and are amenable to suit in federal court for personal liability and damages

As to Babinski's personal capacity claims, these claims are not considered to be "suits against the state" because they are personal liability claims against individuals who caused Babinski harm by violating his rights. The Supreme Court has already unanimously rejected the defendants' argument here, explicitly holding that "the Eleventh Amendment does not erect a barrier against suits to impose individual and personal liability on state officials under [42 U.S.C.] § 1983." *Hafer v. Melo*, 502 U.S. 21, 30–31 (1991).

The Court also rejected defendants' contention that state employees are not "persons" under § 1983 and that acts taken in the discharge of a state official's duties cannot lead to personal liability. *Hafer* considered whether the Eleventh Amendment and § 1983 permitted a state official

to be personally, individually liabile for damages when discharging her official duties. Finding in the affirmative, the Supreme Court unanimously stated:

> We hold that state officials, sued in their individual capacities, are "persons" within the meaning of § 1983. The Eleventh Amendment does not bar such suits, nor are state officers absolutely immune from personal liability under § 1983 solely by virtue of the "official" nature of their acts.

*Hafer*, 502 U.S. at 31.

As stated in the complaint, the claims against Shannon Walsh, John Fletcher, and Alan Sikes are in their personal capacities. (Rec. Doc. 1 at ¶¶ 4-6). The claims against Kristin Sosnowsky are in her personal *and* official capacities. (Rec. Doc. 1 at ¶ 3). The claims against these defendants in their personal capacities, as the Supreme Court holds in *Hafer*, are not barred by the Eleventh Amendment or § 1983 and should proceed.

## III.    Babinski has stated a claim under the First Amendment regardless of the standard applied to his speech

Defendants improperly characterize Babinski's speech as completely unprotected under the Supreme Court's student speech framework post-*Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969). But these assertions are wrong—they are a gross oversimplification of the state of student speech jurisprudence and an incorrect description of the rights and obligations of the parties. In fact, Babinski's speech can be characterized in different ways. Each standard offers Babinski's performative paper at least some protection and requires the defendants to act both proportionally and reasonably, which they did not do. Further, under each standard, defendants are required to supply their justification for their acts as affirmative defenses; they cannot rely on the Court to supply them. Regardless of the standard applied, Babinski has stated a claim for relief, and defendants' motion to dismiss should be denied.

Importantly, the three post-*Tinker* Supreme Court cases defendants cite concern speech by minors to other minors in a public *high school* setting. *See Morse v. Frederick*, 551 U.S. 393 (2007) (high school students suspended after unfurling a banner reading "BONG HiTS 4 JESUS" at a public high school-sponsored event); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) (high school principal properly excised articles about teen pregnancy and divorce from high school newspaper); *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986) (high school student suspended for delivering a speech to a high school student assembly containing "elaborate, graphic, and explicit sexual metaphor[s]"). The Court in each instance predicated its decision at least in part on the deleterious effects the speech could have on its young audience. *Morse*, 551 U.S. at 408 (noting "[t]he particular concern to prevent student drug abuse at issue here"); *Kuhlmeier*, 484 U.S. at 274-75 ("It was not unreasonable for the principal to have concluded that such frank talk was inappropriate in a school-sponsored publication distributed to 14–year–old freshmen and presumably taken home to be read by students' even younger brothers and sisters."); *Fraser*, 478 U.S. at 683 ("The speech could well be seriously damaging to its less mature audience, many of whom were only 14 years old and on the threshold of awareness of human sexuality.").

However, the Supreme Court has held for decades that "state colleges and universities are not enclaves immune from the sweep of the First Amendment." *Healy v. James*, 408 U.S. 169, 180 (1972). More pointedly, the Court affirms that "the mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of conventions of decency." *Papish v. Bd. Of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973) (internal quotations omitted). Even Chief Justice Burger, dissenting in *Papish*, recognized that "[s]tudents are, of course, free to criticize the university, *its faculty*, or the Government in vigorous, or even harsh, terms." *Papish*, 410 U.S. at 672 (Burger, C.J., dissenting) (emphasis added).

Babinski's speech is therefore entitled to protection, and the defendants were required to act reasonably and proportionally to whatever effects that speech caused. But regardless of the level of protection afforded or standard employed to evaluate Babinski's speech, the defendants were not allowed to effectuate Babinski's *de facto* expulsion from the Ph.D. program by refusing to maintain him in the program. Even assuming that Babinski was subject to some form of discipline, which the LSU Office of Student Advocacy and Accountability twice found was not appropriate, (Rec. Doc. 1 at ¶ 25), that discipline could not, under any applicable standard, be a prohibition on continuing in his academic program and an effective expulsion. Babinski has therefore stated a claim against the defendants for violation of his First Amendment rights.

A.    **Babinski's performative paper was pure student speech and did not cause a substantial disruption**

1.    **The *Tinker/Burnside* "substantial disruption" standard applies to Babinski's performative paper**

Babinski's performative paper constitutes "student speech"; the speech occurred while Babinski was a student at LSU and was made in connection with a campus activity. *See Papish*, 410 U.S. at 670; *Tinker*, 393 U.S. at 509. In such a case, the Fifth Circuit employs the "substantial disruption" test it originally devised in *Burnside v. Byars*, 363 F.2d 744 (5th Cir. 1966), and the Supreme Court adopted in *Tinker*, 393 U.S. at 513. *See Jenkins v. La. State Bd. of Educ.*, 506 F.2d 992, 1002 (5th Cir. 1975) (applying *Tinker/Burnside* to disciplinary actions against students at Grambling College); *Shamloo v. Miss. State. Bd. of Trs. of Insts. of Higher Learning*, 620 F.2d 516, 521-22 (5th Cir. 1980) (applying *Tinker/Burnside* to disciplinary action against Jackson State University students for on-campus speech). This standard permits restriction of student speech only when it causes, or is reasonably projected to cause, a substantial disruption to the campus learning environment. *Tinker*, 393 U.S. at 509. In the absence of any contrary pronouncements by

the Supreme Court or the Fifth Circuit, *Tinker/Burnside* provide the standard by which Babinski's claims must be evaluated.

But the outer limits of acceptable speech on a public university campus is not coextensive with that of a public high school. By the same token, a "substantial disruption" among minors in high school is a much lower bar than that among adults in postgraduate courses. Judge Goldberg's dissent in *Mississippi Gay Alliance v. Goudelock*, 536 F.2d 1073 (5th Cir. 1976), recognized as much: "[t]he tradition of academic freedom and the greater maturity of students on a college campus suggest that courts should be particularly solicitous of first amendment rights in such a setting. 536 F.2d 1073, 1079, n.8 (5th Cir. 1976) (Goldberg, J., dissenting) (citing *Papish*, 410 U.S. at 670). Defendants must therefore show that Babinski's performative paper caused a serious and material disruption to the learning environment of the theatre department.

The fact that Babinski's performative paper was submitted to his intended audience in the context of a course assignment, as defendants claim, is irrelevant as neither the Supreme Court nor the Fifth Circuit make such a distinction or hold that speech to be inferior to other forms of student speech. *Tinker* assumes that its pronouncements apply to "the supervised and ordained discussion which take place in the classroom" and goes on to specify that "conduct by the student, *in class or out of it*, which for any reason . . . materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Tinker*, 393 U.S. at 513 (emphasis added). A performative paper submitted to a professor is unquestionably "conduct by [a] student in class", to which *Tinker* must apply.

## 2.    Babinski has pleaded facts that state a claim under *Tinker/Burnside*

The facts as pleaded in the complaint show that Babinski's performative paper was both an expressive, literary device and a harsh criticism of the Ph.D. program's faculty. Babinski

specifically alleges that he "used 'performative writing' to express how he felt discrimination and mistreatment when he expressed his views inside and outside of class." (Rec. Doc. 1 at ¶ 20). He alleges that he used a literary device known as "performative writing" that he learned through the Ph.D. program as a mechanism to convey his message to the defendants who he felt were not hearing his concerns. (Rec. Doc. 1 at ¶¶ 20-23). This is pure speech and is entitled to heightened protections even in a university environment.

Moreover, Babinski's complaint pleads specific facts that show no substantial disruption of the learning environment occurred. Babinski alleges that even though the LSU Police Department reviewed his performative paper twice, it did not find actionable security issues against anyone, including Babinski. (Rec. Doc. 1 at ¶ 25). Likewise, the LSU office charged with disciplining students for conduct violations twice found no basis to take action against Babinski, including refusing to issue a "no-contact directive" against Babinski toward individuals mentioned in Babinski's performative paper. *Id.* Nevertheless, instead of simply giving Babinski a zero on an assignment that was deemed not to conform to its prompt, the defendants acted in concert to effectively expel Babinski from the program and silence him after they learned they could not expel him through ordinary channels. (Rec. Doc. 1 at ¶¶ 29-30). On its face, the complaint states a claim against the defendants for violation of Babinski's First Amendment rights.

Finally, substantial disruption is an affirmative defense that must be properly pleaded and proven by defendants. Predicating a motion to dismiss on an affirmative defense is not appropriate unless the applicability of the defense is evident from the face of the complaint. *McNeal v. La. Dep't of Pub. Safety & Corr.*, CV 20-312-JWD-EWD, 2021 WL 359737, at *14 (M.D. La. Feb. 2, 2021). Defendants cannot use a motion to dismiss to escape their burden of pleading their defenses and presenting evidence to support them.

**B.    Even if Babinski's performative paper constitutes "curricular speech", the defendants did not act reasonably in response to it**

**1.    This Court should not apply *Kuhlmeier* to Babinski's performative paper**

The *Tinker* "substantial disruption" standard is applicable to this case and should be used to evaluate Babinski's speech claims. Defendants urge this Court to stretch *Kuhlmeier* beyond its logical limits and follow the Second Circuit's decision of *Collins v. Putt*, 979 F.3d 128 (2d Cir. 2020), which appears to place few restraints on what speech is "school sponsored" even though *Kuhlmeier*'s limitations are clearly established. *Collins* ignores the school-as-publisher underpinnings of *Kuhlmeier* in favor of an expansive rule characterizing nearly all in-class speech as that which one would "reasonably perceive to bear the imprimatur of the school . . . ." *Collins*, 979 F.3d at 134. *Collins* is not consistent with *Kuhlmeier* or Fifth Circuit precedent, and *Kuhlmeier* is inapposite to the facts pleaded in the complaint.

*Kuhlmeier*'s ultimate holding was that a high school principal could reasonably omit certain articles from a school-sponsored newspaper. *Kuhlmeier*, 484 U.S. at 273. While the Supreme Court discussed this holding in the context of an academic course for credit (the newspaper was published through the high school's journalism course), the operative question the Court answered was "whether the First Amendment requires a school affirmatively to promote particular student speech." *Id.* at 270-71. The concern was an institution's ability to regulate messages *disseminated to an audience* that the audience may attribute to the institution itself rather than individual speakers. *See id.* at 271-72 ("Educators are entitled to exercise greater control over [school-sponsored] student expression to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not

erroneously attributed to the school.") The "imprimatur of the school" aspect of *Kuhlmeier* is its most important element, a consideration wholly absent from Babinski's performative paper.

Further, as alleged in his complaint, Babinski's performative paper was more than just deemed a nonconforming academic assignment. Babinski intended and used his performative paper as a way to reach the defendants and lodge complaints about the way he was treated and the lack of academic integrity in the THTR 7923 course. (Rec. Doc. 1 at ¶ 20). The performative paper was unquestionably what Chief Justice Burger considered to be harsh criticism of faculty in his *Papish* dissent, discussed above. And yet, applying *Kuhlmeier* would create the absurdity that the only mechanism whereby Babinski could ensure that his intended audience would hear his legitimate academic concerns would result in less protection for his expression of those concerns.

Finally, defendants' own actions belie their characterization of Babinski's paper as merely curricular speech. If Babinski's paper simply constituted an assignment submitted for class, then *why did the consequences extend so far outside the course for which the paper was submitted?*

2.   **Even under the *Kuhlmeier* standard, defendants' refusal to teach Babinski and permit him to continue in the program were not reasonably related to legitimate pedagogical concerns**

But even applying *Kuhlmeier* and its progeny to Babinski's claims, his complaint still states a cause of action against the defendants because their response to Babinski's performative paper so far exceeded any reasonable relation to legitimate pedagogical concerns. Had defendant Shannon Walsh simply decided to give Babinski a zero on his performative paper, this would be a vastly different case. However, when defendants took the harsh additional step of foreclosing Babinski's continuation in the Ph.D. program and discontinuing his academic benefits because of his paper, they were no longer acting within the bounds of what is constitutionally permissible.

In cases involving curricular speech, the speech at issue does not lose all protection. Rather, restriction of this speech is appropriate only when it is based on a "legitimate pedagogical concern". *Kuhlmeier*, 484 U.S. at 270-71. As a result, defendants are incorrect in their assertion that this case should be dismissed at the pleadings stage. Applying this standard, it is the defendants' burden to plead and prove that the defendants' acts that denied Babinski the ability to continue in the theatre Ph.D. program were based on such a legitimate, non-pretextual pedagogical concern. *See Axson-Flynn v. Johnson*, 356 F.3d 1277, 1291-93 (10th Cir. 2004).

Under no set of circumstances could the facts as pleaded in the complaint (faculty members' collusion to deny a student's continuation in an academic program because of a paper that student wrote criticizing the faculty) be constitutionally appropriate. Indeed, of the handful of cases adopting the curricular speech doctrine as a legitimate extension of *Kuhlmeier*, almost none involve completely foreclosing a student's ability to continue in an academic program. *See, e.g., Collins*, 979 F.3d at 171 (professor removed a student's post from a message board); *Brown v. Li*, 308 F.3d 939, 945 (9th Cir. 2002) (student was not allowed to include a "disacknowledgements" section in his thesis but still received his master's degree); *Settle v. Dickson Cty. Sch. Bd.*, 53 F.3d 152, 155 (6th Cir. 1995) (high school teacher could give a zero grade for a research paper on "The Life of Jesus Christ" when the paper did not conform to the course assignment). The one case that did involve a student's foreclosure from continuing in a university program involved a student's ongoing refusal to participate in certain classroom activities because of the student's beliefs, and the court reversed summary judgment in the university's favor on the student's speech claim. *Axson-Flynn*, 356 F.3d at 1291-93 (a Mormon student refused to recite profanity in acting courses, and the faculty required the student to recite the words or find another program).

In sum, even if this Court chooses to apply the curricular speech doctrine, (which is not the controlling Fifth Circuit standard), dismissal at the pleading stage is inappropriate. Babinski has alleged in his complaint that he was effectively expelled from the Ph.D. program in retaliation for a paper he wrote criticizing the department and its faculty. These consequences are so out of proportion to the context in which the speech was made, and there is no evidence that his *de facto* expulsion was related to a legitimate pedagogical concern. Babinski has made out a *prima facie* case for violation of his First Amendment rights. The defendants must now plead and prove their affirmative defenses; they cannot rely on the Court to supply them.

IV.  **Continuing in the Ph.D. program is a vested property right, but if not, Babinski has a protected liberty interest that defendants injured without due process**

Defendants ask this Court to find that no process whatsoever is due to a student enrolled in good standing in a graduate program of education before three faculty members may unilaterally refuse to teach that student and end his progress toward his graduate degree. This is not a case of a student removed from a program after persistent academic or disciplinary infractions, nor is it a case where policies and procedures for discipline exist but were sloppily followed. Instead, three professors, encouraged and assisted by their departmental superiors, and after finding no official way to expel him, simply and plainly decided that they could end a student's tenure in a program to which the student was admitted after the student had completed four semesters of coursework.

A.  **Babinski's vested property interest was LSU's obligation to confer a Ph.D. degree upon him provided that he paid tuition, satisfied course requirements, and abided by LSU's rules and regulations**

A synthesis of the relevant cases, including those defendants cite, leads to the conclusion that Babinski's admission to the theatre Ph.D. program, his payment of tuition (or rendering of services in exchange for a tuition waiver), and his continued compliance with university regulations and the requirements of his degree program vested a contractual property interest in

13

proceeding toward his degree. The Supreme Court holds that property rights are determined and defined by independent sources like state law or rules. *Goss v. Lopez*, 419 U.S. 565, 572-73 (1975) (citing *Bd. of Regents v. Roth*, 419 U.S. 565, 577 (1972)). The Louisiana Civil Code's provisions on obligations and contracts provide the rules underpinning Babinski's property interest in continuing in the Ph.D. program toward his degree.

Babinski's enrollment at LSU is, in its most basic form, a contract. Upon enrollment, Babinski agreed to pay tuition (or provide services in exchange for a tuition waiver), to abide by university policies and procedures, and successfully complete the requirements for the degree of Ph.D. in theatre. In return, LSU agreed to confer upon Babinski a theatre Ph.D. degree. This agreement has all the elements of a bilateral contract under Louisiana law. La. Civ. Code art. 1908 ("A contract is bilateral . . . when the parties obligate themselves reciprocally, so that the obligation of each party is correlative to the obligation of the other."). By these principles, Babinski possesses a conditional obligation enforceable against LSU, subject only to the conditions that he successfully complete the Ph.D. program, comply with his tuition duties, and abide by LSU's policies and procedures. *See* La. Civ. Code art. 1767 ("If the obligation may not be enforced until the uncertain event occurs, the condition is suspensive."). Louisiana law gives Babinski every right to preserve the enforceability of LSU's obligation to him while he is pursuing his coursework. La. Civ. Code art. 1771 ("The obligee of a conditional obligation, pending fulfillment of the condition, may take all lawful measures to preserve his right."). These considerations are the hallmarks of a vested property right. As the Supreme Court holds, "[t]o have a property interest in a benefit, a person . . . must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577. Louisiana law provides Babinski with a valid

conditional obligation against LSU that he is allowed to protect until it becomes enforceable, a relationship confirmed to Babinski by an LSU official.

To the extent any of this is unclear from the complaint, Babinski requests leave of court to amend his complaint to conform to the discussion above.

**B.    Courts assume a vested property interest against arbitrary harsh punishment**

There is clearly a protected interest at play in this case because the Supreme Court and Fifth Circuit recognize that process should be due to Babinski before he can be effectively expelled. On multiple occasions, the Supreme Court has assumed the existence of a vested property right in the education context. *See, e.g., Bd. of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 82 (1978); *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 223 (1985). Further, in *Smith v. Davis*, 507 Fed. Appx. 359, unpub. (5th Cir. 2013), a case heavily relied upon by defendants, the Fifth Circuit recognized that due process in cases of severe sanction by academic institutions is still owed to students:

> Most case law involving due process in the educational setting concerns student dismissals or suspensions from academic institutions.  In such circumstances, the Supreme Court has held students are afforded limited due-process protections, in the form of an "informal give-and-take" between the student and the administrative body dismissing him that would, at least, give the student the opportunity to characterize his conduct and put it in what he deems the proper context.

*Smith*, 507 Fed. Appx. at 362 (internal quotations and citations omitted) (citing *Horowitz*, 435 U.S. at 82; *Goss*, 419 U.S. at 584 (1975)). But unlike the plaintiff in *Smith*, Babinski was not simply given a failing grade in a course—he was arbitrarily and capriciously prevented from continuing toward his degree by the defendants even though he did not break any rules or default on his obligations to LSU.

Note that *Smith* includes "suspensions" in the circumstances where the Fifth Circuit recognizes that constitutional process is due. A suspension in the educational context is generally understood as a disciplinary action whereby a student is excluded from campus for a set number of days before returning to regular coursework. The student is not prevented from finishing his degree program or otherwise arrested in his academic progress other than by the delays or consequences incidental to his suspension. And yet the Supreme Court still holds that student is entitled to due process because of the severe nature of the punishment.

The other cases defendants cite do not involve sanctions as severe as those the defendants imposed on Babinski. *Nevares v. San Marcos Consolidated Independent School District*, 111 F.3d 25 (5th Cir.1997), involved only the transfer of a high school student from a traditional school to an alternative school; the end result of the student's academic progress was still the same. *Arundar v. DeKalb County School District*, 620 F.2d 493 (5th Cir. 1980) involved even more attenuated interests: a high school student was not allowed to enroll in certain courses that could later potentially lead to enrollment at an undetermined university in an undetermined "highly technical field". *Arundar*, 620 F.2d at 494. Finally, *Barnes v. Symeonides*, No. 94-30314, unpub. (5th Cir. Jan. 3, 1995), 1995 WL 10518, does concern removal of a law student from the school's rolls, but this removal was due solely to nonpayment of tuition and fees after the student was given several options to pay his outstanding debt. *Barnes*, No. 94-30314 at *1. Failure to pay tuition is a failure of one of the conditions underlying the law school's obligation to the student, making the student's obligation against the law school unenforceable. No rational person would question that dropping the plaintiff for failure to pay tuition and fees was an appropriate exercise of the law school's authority, especially after the plaintiff was given "repeated extensions and warnings". *Id.*

Whereas, in this case, the defendants wholly excluded Babinski from completing his course of study and receiving his degree without allowing Babinski to "characterize [his] conduct" before the defendants made a final, irreversible decision on his ultimate fate. This punishment is far worse than a mere suspension with a subsequent return to academic progress—the defendants effectively expelled Babinski from the Ph.D. program and prevented him from receiving his degree. To suggest that no process is due Babinski here calls into question whether process is ever due a student against arbitrary acts by faculty or administrators, or whether these officials may silence a student and decide his academic fate by capricious fiat.

### C.    Babinski's protected liberty interests were also violated

Alternatively, this Court should permit Babinski to amend his complaint to allege a protected liberty interest that defendants injured without due process. The Due Process Clause protects both property and liberty interests from infringement by the government. "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, the minimal requirements of the [Due Process] Clause must be satisfied." *Goss*, 419 U.S. at 574 (citing *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971); *Roth*, 408 U.S. at 573 (internal quotations omitted)). Interests like standing and reputation in the community and the ability to secure future employment are all liberty interests that the Due Process Clause protects. *Roth*, 408 U.S. at 573.

Babinski has already alleged that the defendants acted in concert to diminish his reputation in the community. (Rec. Doc. 1 at ¶¶ 27-28). He has also alleged that the defendants deprived him of professional benefits and opportunities through their actions. (Rec. Doc. 1 at ¶¶ 32, 63-64). Subsequent to filing his complaint, Babinski has learned that at least one defendant has discussed Babinski's academic progress and performative paper with at least one person not involved in this

case who is a student. This constitutes a continuing violation of Babinski's rights and a continued injury to his liberty interests in his reputation among his peers. Should the existing allegations of the complaint not be sufficient to allege a protected liberty interest, Babinski requests leave of court to amend his complaint to conform to the discussion above.

## V.    Babinski has pleaded facts to show he was a class of one, but if not, he should be permitted to amend his petition to further state the facts underlying his Equal Protection claim

As described above, Babinski alleged that he was misled and was not given opportunities to continue in the Ph.D. program even though other LSU students were given these opportunities. (Rec. Doc. 1 at ¶ 30). To state a claim for violation of equal protection based on disparate treatment of a "class of one", a plaintiff must only allege that he was treated differently than others similarly situated without a rational justification. *See, e.g., Sioux City Bridge Co. v. Dakota Cty., Neb.*, 260 U.S. 441, 446 (1923); *Allegheny Pittsburgh Coal Co. v. Comm'n of Webster Cty.*, 488 U.S. 336 (1989); *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

In the alternative, Babinski requests leave of court to amend his complaint to clarify and expound upon the allegations made. Babinski, out of respect for nonparties to this suit, and hoping to prevent the defendants from also retaliating against those who are current students, refrained in his complaint from referring to specific persons who advised Babinski and shared information about disparate treatment of other students. But defendants have forced Babinski's hand. Babinski can allege that he was specifically advised by representatives of LSU, including its ombudsperson and senior vice-provost, and by other students of situations where students were allowed to circumvent obstructionist faculty and assemble a dissertation committee using non-Ph.D. faculty. Babinski was further specifically advised by an authority from the graduate school that alternative accommodations for general exams should be made. Some of these options were denied to

Babinski after he asked about them, which shows disparate treatment from similarly situated students. Babinski can and will provide more specific allegations on this point with the Court's permission.

**VI.   The complaint clearly states facts giving rise to a claim for conspiracy to violate Babinski's constitutional rights**

Babinski has pleaded facts that give rise to a claim for conspiracy. Importantly, as this Court notes, a claim for conspiracy under § 1983 "need not meet a probability requirement at the pleading stage; plausibility simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Lefebure v. Booker*, 390 F. Supp. 3d 729, 763 (M.D. La. 2019) (Dick, J.) (internal quotations omitted) (quoting *Jabary v. City of Allen*, 547 Fed. Appx. 600, 610 (5th Cir. 2013)), *rev'd on other grounds sub. nom*, *Lefebure v. D'Aquilla*, No. 19-30702, (5th Cir. Feb. 9, 2021); 2021 WL 457798. Rather, the facts pleaded and considered in context must raise the suggestion of a prior agreement, not merely "parallel conduct that could just as well be independent action." *Id.*

In paragraph 29 of the complaint, Babinski alleges that Defendants Walsh, Fletcher, and Sikes, acting in concert, and after learning there were no grounds to expel Babinski from LSU, collectively refused to further teach Babinski, administer his general exams, or serve on his dissertation committee, which was calculated to prevent Babinski's continued progress and in which Defendant Sosnowsky participated and condoned. (Rec. Doc. 1 at ¶¶ 29-30). The complaint further states that these three defendants make up three-fourths of the program's Ph.D. faculty. *Id.* On information and belief, these defendants continued in their collective refusal to teach Babinski even after he made overtures to them. (Rec. Doc. 1 at ¶ 31). These facts, coupled with Babinski's allegation that the defendants conspired to violate his rights through correspondence and other acts, (Rec. Doc. 1 at ¶ 56), are sufficient to state a claim that these defendants, in various

combinations and acting in concert, 1) acted to deprive Babinski of his rights by refusing to teach him or administer his general exams because of his performative paper, 2) collectively retaliated against Babinski for his speech, 3) collectively refused Babinski the opportunity to be heard on their unilateral decision, 4) collectively deprived Babinski of the liberty or property interest of continuing in the Ph.D. program and the liberty interest of pursuing his chosen profession and of his reputation, and 5) collectively treated Babinski differently from other students similarly situated. These facts defeat the suggestion the defendants were all acting independently and did not conspire, collude, or act in concert to deprive Babinski of his rights.

In the alternative, and only if this Court determines that the allegations in the complaint are not sufficiently precise, Babinski requests leave of court to amend his complaint to clarify and expound upon the allegations made. Babinski can allege specific communications from and correspondence between the defendants wherein they discuss actions to be taken against him and show a plan to act in concert to deny his continuation in the program, because Babinski has these emails in his possession.

## VII. Qualified Immunity is inappropriate because Babinski's complaint states causes of action for the blatant violation of his rights and those rights were clearly established

As defendants correctly state, qualified immunity requires a two-part analysis: (1) whether a constitutional right was violated, and (2) whether that right was clearly established at the time of the alleged violation. *Sims v. City of Madisonville*, 894 F.3d 632, 638 (5th Cir. 2018). As discussed at length above, Babinski has clearly stated claims that the defendants violated his constitutional rights. Further, these rights were bolstered by decades of precedent such that any reasonable actor in the defendants' situation would have to know the defendants' actions were contrary to law. Here, defendants cannot credibly claim that they did not know they could not effectively expel

Babinski for a paper he wrote that they did not like. This Court should therefore deny defendants' claim of qualified immunity.

Qualified immunity serves an important purpose, but it is not absolute. The Supreme Court recognizes that the doctrine should only apply to those government officials who "perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). On the other hand, a government official who abuses her office is rightly subject to an action for damages, which is often the only avenue to vindicate an injured person's rights. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982)).

As the discussion above shows, defendants violated Babinski's constitutional rights in several respects based on the allegations of the complaint. Babinski adopts by reference sections III through VI in support of the first element of the qualified immunity analysis, *i.e.*, whether his constitutional rights were violated.

### A. The contours of Babinski's rights have been well-established for decades, and defendants cannot credibly claim they believed their acts were permissible

As a threshold matter, this is not a situation where identical factual precedent is required to satisfy the "clearly established" element of qualified immunity. The inquiry on Babinski's claim is not some nebulous "reasonableness" or "totality of the circumstances" standard, but rather well-defined jurisprudential tests that analyze the allegations of the complaint and the affirmative defenses pleaded and proved by the defendants. In cases outside the realm of the Fourth Amendment, exact factual similarity to a precedent case is not required. *See Mitchell v. Forsyth*, 472 U.S. 511, 535, n. 12 (1985).  Rather, as the Supreme Court holds, "in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). The guiding principle behind a "clearly established" inquiry is whether the offending officer had "fair notice" that her conduct was unlawful. *Id.* at 739-40.

What is most important in a qualified immunity analysis is whether the *rule* is sufficiently clear and settled law. *Dist. of Columbia v. Wesby*, 138 S.Ct. 577, 589-90 (2018) ("The *rule* must be settled law . . . it is not enough that the *rule* is suggested by then-existing precedent . . . the precedent must be clear enough [] to establish the *rule* . . . ." (emphasis added)). But unlike probable cause in the Fourth Amendment context, the law underlying Babinski's claims can, and has, been "reduced to a neat set of legal rules." *Id.* at 590 (citing *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). And these rules are so prevalent in the realm of students' rights that no reasonable professor or university administrator could conclude that Babinski could be effectively expelled from a program for a paper he wrote criticizing the program's faculty after the university's disciplinary apparatus declined to discipline him. *See Taylor v. Riojas*, 141 S.Ct. 52, 53-54 (2020) (quoting *Hope*, 536 U.S. at 741 ("a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question")).

As to Babinski's First Amendment claims, both of the potentially applicable standards discussed above, the *Tinker/Burnside* substantial disruption standard and the *Kuhlmeier* "legitimate pedagogical concern" standard, have been in use and applicable to student speech for over sixty and thirty years, respectively. In fact, the Fifth Circuit has applied *Tinker* to university on-campus speech for forty-six years. *See Jenkins*, 506 F.2d at 992 (decided in 1975). But even if this Court decides that *Kuhlmeier*'s more restrictive "curricular speech" doctrine applies, other circuits have applied this standard since at least the 1990s. *See Settle*, 53 F.3d at 152 (decided in 1995). The rule here, regardless of which standard is applied, is clear and demonstrates that the defendants violated Babinski's rights.

Likewise, the requirement that schools afford due process to students facing severe academic sanctions like suspension or expulsion and the pattern of assuming a vested property

right in continued education has been established law since at least 1978. *See Horowitz*, 435 U.S. at 78 (decided in 1978). And the Fifth Circuit's requirement for "informal give-and-take between the student and the administrative body dismissing him" has been established law since at least 2013. *Smith*, 507 Fed. Appx. at 359 (decided in 2013). Finally, the liberty interests of reputation and pursuit of future employment opportunities have been recognized by the Supreme Court for almost fifty years. *Roth*, 419 U.S. at 577 (decided in 1972). The constitutional right of equal protection concerning a "class of one" is likewise firmly rooted in American constitutional law for nearly a century. *See, e.g., Sioux City Bridge Co. v. Dakota Cty., Neb.*, 260 U.S. 441, 446 (1923); *Allegheny Pittsburgh Coal Co. v. Comm'n of Webster Cty.*, 488 U.S. 336 (1989); *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

The defendants here were not officers in the field making split-second life-or-death decisions. They had months to carefully consider and research the actions they took against Babinski. The entire wealth of knowledge of the internet was at the defendants' disposal, as were multiple LSU campus libraries, one of which is devoted solely to law.[1] And most damning of all, defendants had the benefit of the LSU Department of Legal Affairs and General Counsel for advice and consultation.[2] All of these resources would have surely counseled against the defendants' rash course of action, but there is no evidence the defendants did any thoughtful consideration before arbitrarily choosing to end a student's academic progress. The result is acts by the defendants that would shock the conscience of reasonable educators, students, and neutral observers.

---

[1] https://www.lib.lsu.edu.
[2] https://www.lsu.edu/general-counsel/.

**B.    Alternatively, dismissal under qualified immunity is inappropriate at this stage of this litigation because qualified immunity will depend on defendants' yet-to-be-pleaded affirmative defenses**

Qualified immunity is an affirmative defense that must be pleaded by a government official. *Siegert v. Gilley*, 500 U.S. 226, 232 (1991). When qualified immunity is claimed as a basis for a motion to dismiss, the court can only base its decision on the facts pleaded in the complaint and the applicable law. When entitlement to qualified immunity depends on further factual development, the court may deny qualified immunity and order discovery tailored to determine whether immunity is appropriate. *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012). Of course, the court must first be satisfied that the complaint pleads sufficient facts that, if proven true, would defeat a qualified immunity defense. *Id.*

Defendants here expect the Court to do their work for them by supplying their affirmative defenses and rationale for their acts. As discussed above, the law underpinning Babinski's claims is well-settled and requires defendants to plead and prove justifications for their acts. Babinski cannot be reasonably expected to respond to defendants' claimed defenses and rationale for their actions when defendants won't even advise the court of their nature. What was the substantial disruption Babinski's performative paper allegedly caused? What disruption do defendants claim could foreseeably occur in the future, and how can they determine that it reasonably would occur? What is defendants' justification for not approaching Babinski to give him a chance to characterize his behavior and why did they refuse to meet with him when he repeatedly asked? What was the legitimate pedagogical concern underpinning defendants' decision to end Babinski's progress in the Ph.D. program? What was the rational basis for refusing to permit Babinski alternatives to continue toward his degree? All of these questions are important to the court's analysis, and yet defendants have answered none of them.

Qualified immunity is inappropriate here and should be denied. But, out of an abundance of caution and only if the Court is inclined to entertain qualified immunity in this case, the Court should require defendants to plead and offer factual support for their affirmative defenses first.

CONCLUSION

Babinski has stated claims for relief on all the counts in his complaint, as discussed in detail above. But to the extent this Court finds that Babinski's complaint does not sufficiently state the facts and principles outlined herein, Babinski requests leave to amend his complaint to conform to the discussion in this memorandum.

Respectfully Submitted:

_____
EVAN J. BERGERON (#33725)
**Winston Bergeron, LLP**
1700 Josephine Street
New Orleans, LA 70113
Telephone: 504-577-2500
evan@winstonbergeron.com
*Counsel for Plaintiff, Andrew Babinski*

**CERTIFICATE OF ELECTRONIC FILING**

I hereby certify that on March 2, 2021, a copy of the forgoing Memorandum in Opposition to Motion to Dismiss was filed electronically with the Clerk of Court using the CM/ECF system.

All counsel will be served through the CM/ECF system. There are no non-CM/ECF participants.

_____
Evan J. Bergeron